**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                          |     |                           |
|--------------------------|-----|---------------------------|
|                          | *   |                           |
| **LAMAR A. WILLIAMS**    | *   |                           |
| **Plaintiff**            | *   |                           |
| **v.**                   | *   | **CIVIL NO.  JKB-17-0066** |
| **BALTIMORE COUNTY**     | *   |                           |
| **GOVERNMENT**           | *   |                           |
| **Defendant**            |     |                           |

\* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM</u>

### I.  Procedural Background

Plaintiff Lamar A. Williams, proceeding *pro se*, filed a complaint against his former employer, Baltimore County Government (the "County"), and, using a form complaint, checked boxes indicating his suit included causes of action under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, various federal statutes (42 U.S.C. §§ 1981, 1983, 1985, and 12203; 5 U.S.C. § 9701; and 2 U.S.C. § 1831), the Maryland Fair Employment Practices Act, and Baltimore County Charter Article 4, Title 5, Subtitle 3 4-5-315(a)(2). (Compl. 3, ECF No. 1.)  He also checked boxes indicating the County discriminated against him through termination of his employment, failure to accommodate his disability, unequal terms and conditions of his employment, retaliation, and other acts, which he described as "Coercion, not allowed to have attorney present during conversation, Denial of Equal Rights Under The Law, Deprivation of Civil Rights and Conspiricy [*sic*] to Interfere with Civil Rights." (*Id.* p. 4.)  The bases of the County's discrimination were alleged to be Williams's race (African-American), his

color (black), his national origin ("United States"), and his disabilities of "Anxiety Disorder, ADHD & Spinal Stenosis." (*Id.*)

He later filed an "Amended Statement of Claims," which the Court deemed his amended complaint.[1]  (ECF Nos. 13, 15.)  In his amended complaint, Williams focused entirely upon alleged violations of the Americans with Disabilities Act ("ADA"), and he alleged the County failed "to engage in a positive flexible interactive dialogue, . . . subjected [him] to multiple adverse actions, never accepted his request to file an ADA discrimination complaint in the Office of Human Resources, placed him on mandatory paid leave, never allowed him to build on his improvement, retaliated, attempted to coerce him into changing his request for accommodations, ignored his request to be transferred to the Department of Public Works and forced a narrative validating their termination of the plaintiff without just cause." (Am. Compl. ¶ 36.)

Although his amended complaint suggests he is contesting his termination, since his filing of that document, he has clearly disavowed any intent to litigate in this case the reason for his termination.  *See* Plaintiff's Memorandum in Support of Concurrently Filed Motions & Leave to File a Post February 9, 2018 Hearing Brief 3, ECF No. 124 ("[I]t has never been my intent to argue in this U.S. District Court of Maryland why I was terminated. . . . this proceeding is [only] regarding the defendant's violation of the Americans with Disabilities Act . . . ." (second alteration in original)); Plaintiff's Response to the Defendant's Motion for Summary Judgment Request for Hearing on the Defendant's Motion 4, ECF No. 127 ("the plaintiff is not litigating why he was terminated [after] the defendant violated the ADA in this Court because the issue of the plaintiff's termination is being litigated in the MD Court of Appeals, the MD Court of Appeals [*sic*] and the Circuit Court of Baltimore County" (first alteration in original)).

---

[1] An amended complaint supersedes the original complaint and renders the original complaint inoperative. *See Young v. City of Mt. Ranier*, 238 F.3d 567, 572 (4th Cir. 2001).

Consequently, the Court will not consider Williams's termination to be an issue in the case. Instead, the Court will focus on whether the County violated the ADA based upon its response to his request for accommodation of his disabilities.

Now pending before the Court is Baltimore County's motion for summary judgment. (ECF No. 104.) No hearing is necessary. Local Rule 105.6 (D. Md. 2016). The motion will be granted.

## II. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal

knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

## III. *Reasonable Accommodation of Disabilities under the ADA*

Section 12112(b)(5)(A) of Title 42, United States Code, bars discrimination against a qualified individual on the basis of disability by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." Under governing regulations, "[t]he term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). What constitutes an essential function is not subject to a hard and fast definition; "[a] job function may be considered essential for any of several reasons," such as, "the reason the position exists is to perform that function," or "because of the limited number of employees available among whom the performance of that job function can be distributed." 29 C.F.R. § 1630.2(n)(2)(i), (ii). Relevant to this case, factors to be considered in determining whether a job function is essential include "[t]he employer's judgment as to which functions are essential," "[t]he amount of time spent on the job performing the function," "[t]he consequences of not requiring the incumbent to perform the function," or "[t]he current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3)(i), (iii), (iv), (vii).

As pertinent here, reasonable accommodation includes "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or

desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).  As applicable to the instant case, reasonable accommodation might include such things as "[j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position; [or] acquisition or modifications of equipment or devices."  29 C.F.R. § 1630.2(o)(2)(ii). "To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

In the absence of undue hardship, an employer must provide a reasonable accommodation "to an otherwise qualified individual" who either has an actual disability or a record of disability.  29 C.F.R. § 1630.2(o)(4).  The term undue hardship means significant difficulty or expense incurred by an employer in providing an accommodation.  29 C.F.R. § 1630.2(p).  Whether an undue hardship exists for the employer depends upon various factors, including "[t]he overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources" and "[t]he impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business." 29 C.F.R. § 1630.2(p)(2)(ii), (v).

## IV. Analysis

Williams's chief contention is that the County did not engage in a flexible, interactive process in response to his request for reasonable accommodations and that he thereby suffered damage, for which he claims an entitlement to an award of back pay, front pay, and

consequential damages.  While it is clear from his various filings that Williams believes, and claims, much of the County's evidence is false, the Court has thoroughly reviewed the record evidence and has found no genuine dispute of material fact on his contention regarding an alleged failure to engage in the interactive process for the purpose of providing him with reasonable accommodations for his stated disabilities.  The County has not disputed Williams has the disabilities of attention deficit hyperactivity disorder ("ADHD"), anxiety disorder, or back and knee pain.  Thus, the only factual question is whether the County met its responsibility to seek ways to accommodate Williams's disabilities.

It is undisputed that Williams was hired by the County as an Engineer II in the Department of Environmental Protection and Sustainability ("DEPS") in February 2009.  He worked in the Storm Water Management division as a reviewer of plans designed to address storm water runoff and surface water runoff from private developments and public projects. (Def.'s Mot. Summ. J. Ex. 2, Gardina Dep. 13:1-16, Dec. 13, 2017, ECF No. 104-4.)  It is also undisputed that for several years, Williams was rated as "successful" on performance evaluations.  However, the director of DEPS, Vincent J. Gardina, explained in his deposition that "successful" means "the minimum requirement to meet the standards of the job."  (*Id.* 28:2-7.)

Williams's immediate supervisor from September 2013 until November 2015 was James Markle.  (Def.'s Mot. Summ. J. Ex. 3, Markle Aff. ¶ 2, ECF No. 104-5.)  During that period of time, Williams was one of five employees in the plans review section of the Storm Water Management division.  (*Id.*)  As Markle described it,

> The primary function of the plans review section is to review private and public development plans to make sure that the proposed project, as built, is in conformance with law.  The Stormwater management review is just one step in the overall Baltimore County development review process, which involves many other County agencies.  Our work is extremely time sensitive and deadline driven . . . .

(*Id.* ¶ 3.)  Markle explained that DEPS has a Master Log system maintained by the County's Office of Information Technology ("OIT").  (*Id.* ¶ 4.)  Each plans reviewer is responsible for documenting inflow and outflow of their assignments in the Master Log.  (*Id.*)  Further, a plans reviewer must submit a "blue slip," indicating a project's completion, to Markle's administrative assistant so she can update the Master Log.  (*Id.*)  Markle stated, "Under departmental protocols even the most complex review is supposed to be completed within 45 days for the initial review and 30 days for successive reviews when the plan is resubmitted."  (*Id.* ¶ 5.)

Markle further stated that Williams "was habitually slow in reviewing his assigned projects and he regularly missed the 30 and 45 day target review deadlines . . . [and he] also repeatedly failed to submit the blue slip upon completion of a review."  (*Id.* ¶ 6.)  Markle said he addressed the situation by frequently assisting Williams in completing his reviews and by assigning Williams fewer and less complex reviews than his peers in the plans review section.  (*Id.*)  In December 2014, when Markle had supervised Williams for a little over a year, Markle drafted Williams's annual performance evaluation.  (*Id.* ¶ 7.)  Markle said he gave Williams an overall "successful" rating, but noted Williams needed improvement in completing his tasks fully and in a timely manner.  (*Id.*)  Markle set two "development goals" for Williams to "improve timeliness of reviews of projects" and to "keep project status reports up to date."  (*Id.*)  Williams acknowledged in his self-evaluation he needed to "work on completing reviews in a more timely manner."  (Def.'s Mot. Summ. J. Ex. 5, Dec. 2014 Evaluation, ECF No. 104-7.)  In May 2015, when Williams continued to have subpar performance, Markle gave him an oral reprimand.  (Markle Aff. ¶ 7; Def.'s Mot. Summ. J. Ex. 6, Documentation of Oral Reprimand, ECF No. 104-8.)  Markle suggested Williams use a spreadsheet to track his projects "so that he can be better organized."  (*Id.*)  Markle's stated objective was "to make Mr. Williams more

organized and efficient so that he can perform an acceptable number of reviews and the Department can track projects." (*Id.*)

Markle noted in his affidavit that, by October 2015, the plans review section "started receiving more and more complaints from other County agencies about the delays caused by [Williams's] untimely reviews." (*Id.* ¶ 10.) The result was that Markle gave Williams an "unsuccessful" performance evaluation in October 2015. (*Id.*; Def.'s Mot. Summ. J. Ex. 10, Oct. 21, 2015, Employee Performance Evaluation Form, ECF No. 104-12.) Markle noted in a memorandum to file that from January 1, 2015, to May 8, 2015, Williams had reviewed 26 projects, which represents an average of 1.4 projects per week, and from May 12 to October 16, 2016, he had reviewed 35 projects or 1.5 projects per week. (Def.'s Mot. Summ. J. Ex. 9, Oct. 16, 2016, Memo to File, ECF No. 104-11.) Further, Williams's average project turnaround time was 5.3 weeks. (*Id.*) In contrast, other plan reviewers in that section averaged four to five project reviews per week and a project turnaround time of 2.5 weeks. (*Id.*)

The Court notes Williams submitted an unsigned affidavit in support of other motions, and in the affidavit he stated, "between the dates of May 12, 2015 until [*sic*] I was subjected to an involuntary transfer per the requirements in the MOU, I had completed well over 100 projects in my que [*sic*], not a measly 35 projects per Mr. Markle's October 16, 2015 memo . . . ." (Williams Aff. ¶ 34, ECF No. 124-6.) This statement, even if it can be regarded as part of a proper affidavit, is somewhat different from Williams's allegation in his unsworn, amended complaint: "[B]etween the dates of May 12, 2015 through October 16, 2015 Mr. Williams had completed a total of 97 SWM reviews, GRA reviews, processed permits, mylars for signatures, environmental agreements and deeds of declaration and easement using his new spreadsheet as

compared to only 38 between the dates of January 1, 2015 through May 12, 2015." (Am. Compl. ¶ 6.)

The most reliable figures for completion of plans reviews appear to be those generated by OIT from the Master Log for the time period January 2, 2015, through October 31, 2015, for Williams and his peers; the summary also includes numbers for Williams's replacement, Mike Doyle, for the time period of January 1, 2017, through October 31, 2017. (Def.'s Mot. Summ. J. Ex. 11, SWM Plans Review Summary, ECF No. 104-13.) To get a true apples-to-apples comparison, the Court will exclude the figures pertaining to Doyle. The summary displays figures for five categories of reviews.

In the category of Concept Stormwater Management Plans, the total number of plans reviewed by Williams and the other four reviewers was 78. Williams reviewed 3, and the average number of days per each of his reviews was 112. In contrast, the average number of days for review by the other reviewers ranged from 12 to 50.

In the category of Grading Plans, the total number of plans reviewed within the section was 484. Williams reviewed 58, and the average number of days for each of his reviews was 42. For the other four reviewers, the average number of days for review ranged from 7 to 24.

In the category of Stormwater Management Plans, the total number of plans reviewed by the five reviewers was 407. Williams reviewed 44, and the average number of days for his reviews was 37. For the other four reviewers, the average number of days for review ranged from 8 to 31.

In the category of Minor Subdivision Plans, the total number of plans reviewed by the five reviewers was 76. Williams reviewed 11, and he took an average 22 days per review. The other four reviewers averaged between 11 and 15 days for their reviews.

In the category of Stormwater Management Variance Requests, the total number of plans reviewed by the section was 36. Williams reviewed 4, and he averaged 72 days per review. The other four reviewers averaged between 8 and 67 days for their reviews.

In total, the number of plans reviewed by the five reviewers from January 2, 2015, to October 31, 2015, was 1,081. Out of that number, Williams reviewed 120. It is evident from the Master Log figures that Williams was not pulling a fair share of the load. It is also evident that he regularly took considerably longer than the other reviewers to accomplish his reviews.

Following the unsuccessful October 2015 performance evaluation, Markle talked with DEPS's Deputy Director, Dave Lykens, and the Director, Vince Gardina, about Williams's lack of productivity, which was causing a workload problem in the plans review section.[2] (Markle Aff. ¶ 11.) The three of them decided Williams would be reassigned to a field inspector position within the Storm Water Management division; the new position would not have the pressures and time constraints of the plans review section, and Williams would keep his job classification with the same pay and benefits. (*Id.*) When informed of the reassignment, Williams "was not happy." Markle further stated, "Apparently he went to [Human Resources] that same or the next day and claimed, for the first time, that he had been diagnosed with ADHD and that he also had problems with his knee and his back that would make the inspector job untenable." (*Id.* ¶ 12.)

Williams disputes the County's evidence that he did not inform the County of his disabilities until October 2015, but that dispute is not critical to resolution of the case because he has provided no evidence that he suffered damage because of a lack of a response to any earlier request he might have made. The record does not disclose an adverse employment action, within

---

[2] Markle indicated in his affidavit that the productivity problem was also linked to the loss of three senior employees at the end of 2012 due to an early retirement incentive program. (Markle Aff. ¶ 11.) Having three fewer employees to carry the workload apparently brought Williams's lack of productivity into sharper focus.

the meaning of employment discrimination laws, until he was terminated in January 2016, after the County had offered him a transfer to a different position.[3]

The day after his performance evaluation, he emailed an assistant to Suzanne Berger, Deputy Director of the County's Office of Human Resources ("OHR"), and requested an appointment to discuss work performance issues. (Def.'s Mot. Summ. J. Ex. 13, Oct. 22, 2015, Email Williams to Rucker, ECF No. 104-15.) Williams and Berger then exchanged a series of emails between October 25 and November 5, 2015. (*Id.*) In those messages, Williams offered to show Berger an evaluation done by one of Williams's doctors and he indicated he was not given reasonable accommodations to better perform his job duties. (*Id.*) Berger indicated she was unable to meet with Williams in person on October 26, 2015, but invited Williams to drop off the evaluation in a sealed envelope for her and also advised him that she would leave at the front desk for him an envelope containing two forms, a Request for Work Place Reasonable Accommodation and a Medical Information Authorization Release Form. (*Id.*) She told him the release form had a section for Williams's physician to complete regarding potentially limiting impairments and any related accommodations needed; she said both forms should be fully completed and returned to OHR. (*Id.*) Berger also told Williams she would be happy to talk with him further after she had reviewed the doctor's report. (*Id.*)

In another message, Berger said the following:

> We have received your verbal request for accommodations in your workplace and we want to work with you to resolve all issues, but we have required procedures which must be followed before we can determine accommodations that may be needed and whether they can be reasonably met. The first step is for you and your medical provider to complete the forms which you picked up from our office

---

[3] "A reprimand, whether oral or written, does not *per se* significantly affect the terms or conditions of employment," but becomes actionable only if it causes real employment injury. *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003), *cited in Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 429 (4th Cir. 2015) (reprimands not leading to further discipline do not qualify as adverse employment actions). Williams has presented no evidence that the oral reprimand or any negative performance evaluation caused him any real employment injury.

last week. These are the "Request for Work Place Reasonable Accommodation" form and the "Medical Information Authorization Release Form." You may have any of your treating providers who are familiar with your health condition and capable of answering the questions complete the Medical Information Authorization Release Form. Please return the completed forms to the Office of Human Resources by no later than **Friday, November 6, 2015.**

The Director of Human Resources, George Gay, spoke with you this afternoon and advised that he is granting you Permission or "P" leave through November 6, 2015. You will be off work as of today, on paid leave, and the time will not be charged to your leave balances during this time. Hopefully this leave will be helpful in giving you the time to meet with your health care provider(s) to complete the ADA forms. Typically an employee completes these forms with his/her medical provider and we review completed forms afterwards. You will be contacted after there has been an opportunity to review what is submitted if we have questions, require any additional information or clarification. We will then determine what the course of action will be.

(*Id.*) In a later message, Berger offered to extend the P leave to accommodate a November 13, 2015, appointment Williams had with one of his health providers. (*Id.*)

On November 12, 2015, an attorney, John H. Morris, Jr., hand delivered a letter to Berger. (Def.'s Mot. Summ. J. Ex. 14, Let. Morris to Berger, Nov. 12, 2015, ECF No. 104-16.) Morris said the purpose of the letter was to provide documentation of Williams's disabilities and to request reasonable accommodation of them. (*Id.* 1) Morris's view was that Williams's supervisors' intended transfer of Williams to the less demanding pond inspector job was "discipline" that could not be imposed based upon Williams's request for reasonable accommodation. (*Id.* 3.) Morris indicated Williams's primary disability in relation to his work performance was ADHD. (*Id.*) The letter set forth a list of accommodations the County should afford Williams. (*Id.* 4.) These included no change in Williams's job assignment for 180 days, time to consult with an ADHD/executive functioning coach during work hours, a work space that offers "a quiet environment, without any distractions," sufficient time for him to complete his tasks, a three-minute break every 30 minutes to re-energize, a larger cubicle, "organizing items

to assist him in organizing work papers," and permission to begin his work day at 7:30 a.m. (*Id.*) Morris then said, "Short of such an accommodation as is here requested, the only determination is that the employer is proceeding is [*sic*] disregard of the law. As counsel for Mr. Williams, I am open to exploring any alternative that resolves this matter short of litigation." (*Id.* 5.)

On November 16, 2015, Berger emailed to Gardina, with a copy to Paul Mayhew (current counsel for the County in this case), the attachments to Morris's letter, which were the psychologist's recommendations relating to ADHD, Reading Disorder, and Anxiety Disorder, recommendations from the doctor treating Williams's back pain, and recommendations from the doctor treating Williams's knee pain; Berger also summarized the fundamental points of those recommendations.[4] (Def.'s Mot. Summ. J. Ex. 16, Nov. 16, 2015, Email Berger to Gardina, ECF No. 104-18.) Berger noted that Williams still "ha[d] not returned the required 'Request for Work Place Reasonable Accommodation' form." (*Id.*) She then stated,

> **Questions:** With respect to the Pond Inspector position you previously identified for Mr. Williams at the Alms House, please advise whether the above restrictions could be reasonably accommodated so as to allow him to perform the essential duties of that position. If not, is there any other available position in your Department which Mr. Williams could perform with or without reasonable accommodations in light of the restrictions identified above?

(*Id.*)

Gardina's response detailed why all of the various restrictions on Williams's activities could not be accommodated in his plans reviewer capacity. (Def.'s Mot. Summ. J. Ex. 17, Nov. 20, 2015, Email Gardina to Berger, ECF No. 104-19.) First, as to the psychologist's

---

[4] The psychologist recommended, in part, "[Williams] should work in a quiet environment, without distractions. He should not surf the Internet, talk on the phone, exchange text messages or instant messages, or do any other cognitively-demanding task while studying." (Nov. 12, 2015, Morris Let., Attachment 1, p. 48.) One of Williams's doctors stated, "[Williams] should not do any sort of physical labor/work, particularly lifting anything over 10 lbs., to include lifting, jumping, bending, stooping, climbing steep hills or uneven terrain. He should be in a mostly sedentary position in order to prevent injury and pain." (*Id.*, Attachment 3, p. 65.) Another medical provider stated in relation to Williams's knee pain, "[Williams] is unable to walk on steep inclines &/or declines[;] no bending, no stooping, no kneeling, no excessive up & down stairs, no prolonged sitting." (*Id.*, p. 69.)

recommendations, Gardina noted that Williams's position in which he reviewed storm water projects "requires communication by telephone and emails with other County departments, consulting engineers, developers, property owners and supervisors. In addition, face to face meetings are also required. It is impossible to provide 'a quiet environment without distractions' as the distractions are part of the job. In regards to surfing the net, exchanging text messages or instant messaging, Mr. Williams should not have been doing those 'distractions.'" (*Id.*)

In response to the psychologist's recommendation that Williams "'should leave himself sufficient time to complete tasks so he can work at his own pace,'" Gardina said,

> The Engineer II position requires that assigned projects be reviewed in a timely manner. There are mandated review times of 30 and 45 days for projects. Therefore, Mr. Williams cannot "work at his own pace." . . . In January of this year, I stopped assigning new projects to Mr. Williams except for an occasional small project in an attempt to allow Mr. Williams to "catch up." I am currently reviewing one of his projects that came in for review in June of this year.

(*Id.*) The time-sensitive nature of the position was also noted in response to the recommendation that Williams take a break every 30 minutes to re-energize. (*Id.*)

The doctors' recommendations about physical activity to accommodate Williams's orthopedic limitations elicited the following response from Gardina: "The Engineer II position, on occasion requires field inspections of stormwater management facilities to check as-built plans of projects that Mr. Williams reviewed. Those inspections may require climbing steep hills or walking on uneven terrain. In addition, the review of stormwater management plans in the office may require 'prolonged sitting.'" (*Id.*) Gardina also determined that the necessary restrictions on Williams's physical activity were inconsistent with the pond inspector position, which also required climbing steep hills, much walking on uneven terrain, and removal of manhole covers in order to make necessary inspections. (*Id.*)

The Court concludes that the County was unable to reasonably accommodate Williams's various restrictions in his plans reviewer position or in the proposed pond inspector position. The next question to be answered is whether the County could have reasonably accommodated Williams's limitations in a different position.

Williams was informed of Gardina's assessment on November 23, 2015. (Def.'s Mot. Summ. J. Ex. 19, Nov. 23, 2015, Email Williams to Berger, ECF No. 104-21.) Williams told Berger that Gardina had directed him to contact her "for another position within Baltimore County." (*Id.*) Berger responded by offering to meet with him on November 24 at OHR "to review the potential for other positions." (Def.'s Mot. Summ. J. Ex. 19, Nov. 23, 2015, Email Berger to Williams, ECF No. 104-21.) In testimony before the County's Personnel and Salary Advisory Board ("PSAB") after Williams's termination, Berger said she spoke with Julie Guilbault, whom Berger described as "head of employment," outlined for her Williams's restrictions, and requested she look at the current vacancy list to see if it included any feasible, alternative position. (Def.'s Mot. Summ. J. Ex. 20, June 16, 2016, PSAB transcript 48-49, ECF No. 104-22.) In the meeting on November 24, the only vacancy that clearly fit Williams's limitations was an account/clerk position; Berger said she encouraged Williams to consider taking it, even though it entailed a significant pay cut, because, at least, he would continue in his County employment and would preserve his benefits, while she and Guilbault looked elsewhere for opportunities. (*Id.* 50.) Guilbault also identified a potential, alternative Engineer II position in a different department; Berger told Williams she would need to investigate that possibility with the Department of Public Works ("DPW") and, if a vacancy existed, Williams would need to take the job description to his doctors to get clearance from them. (*Id.* 49-51.) Otherwise, if the doctors indicated the alternative position was subject to restrictions, then Berger would need

to know what those restrictions were to determine whether the County could accommodate them. (*Id.* 52.)

Berger apparently determined the alternative Engineer II position was, in fact, available and provided the job specifications to Williams so he could take them to his medical providers for their assessment of the position in light of his disabilities. (*Id.* 52-54.) Williams then submitted to Berger on November 25, 2015, the completed Request for Work Place Reasonable Accommodation Form that Williams had obtained from Berger in late October 2015. (Def.'s Mot. Summ. J. Ex. 21, ECF No. 104-23.) He attached to it the release form executed by his psychologist, dated November 3, 2015. (*Id.*)

Williams, Berger, and Guilbault held a follow-up meeting in early December 2015. (PSAB Transcript 55.) On December 11, 2015, he provided the completed forms for the two doctors who treated him for back and knee pain. The doctor who provided treatment for Williams's knee pain cleared him to perform the new position without restrictions. (Def.'s Mot. Summ. J. Ex. 21, p. 88, Release Form, ECF No. 104-23.) The treating physician for Williams's back pain cleared him to perform the new position as long as its duties were as stated in the job description. (*Id.*, p. 89.) The psychologist's November 3 release stated Williams could perform the job with five requested accommodations: (1) larger cubicle space; (2) organizational assistance for his work space; (3) permission to leave work to see therapist and/or ADHD coach on a weekly basis; (4) permission for frequent breaks—10-minute break every hour; and (5) a performance review "every three months with specific and clear feedback."[5] (*Id.*, p. 87.) Since the psychologist's assessment was dated November 3, 2015, which predated identification of the Engineer II position in DPW, it is unknown about which position the psychologist was opining.

---

[5] The Court notes the psychologist's restrictions did not include his earlier statements as to the work activity being "without distractions" or as to Williams's needing to work "at his own pace."

Berger responded on December 11 to Williams's inquiry as to how soon he could start in DPW by saying,

> I received your packet of information yesterday including doctor's notes that identify your revised physical restrictions. As we discussed, this (addressing physical restrictions) was Step 1 of the process—identifying whether you would be able to transfer to the Engineer II position with DPW, from a physical standpoint only.
>
> Step 2, which I had explained to you would follow, is a separate and equally important factor in the process—an assessment of whether the Department (DPW) can reasonably provide, without undue hardship, the additional requested accommodations that you and your health care provider have identified related to your ADHD condition. Although you have provided various written descriptions of requested accommodations regarding this condition, some are very broadly written and vague. To clarify the items being requested, so we can clearly understand the nature of the request and evaluate our ability to accommodate, I have scheduled a meeting for you and Steve Walsh, Chief, Bureau of Engineering & Construction, Public Works on **Monday December 14, 2015, at 11:00 a.m. at OHR**. After Mr. Walsh meets with you, he will then consider the accommodations requested and determine the ability of his department to reasonably provide them. As a result of the foregoing, in answer to your specific question, there is no start date at DPW at this time as we are still in the evaluation process regarding the Engineer II position.
>
> I want to also reiterate that when we first met, an Account Clerk position was identified as a vacant position, and one that appeared on the face of it to be consistent with your physical restrictions. At our second meeting I mentioned the open Account Clerk position to you again. As of now this position remains vacant, but you have not indicated any interest in pursuing an application for it.
>
> Please contact my office if you cannot attend the meeting on Monday for any reason.

(Def.'s Mot. Summ. J. Ex. 22, Dec. 11, 2015, Email Berger to Williams, ECF No. 104-24.)

In a letter from Attorney Morris to Berger on December 14, 2015, Morris indicated his desire to be present at the meeting between Walsh and Williams that morning and further indicated that he had directed Williams not to agree to any modification of the various requests for accommodation made in Morris's November 12 letter concerning Williams's ADHD and back condition without first consulting with him. (Def.'s Mot. Summ. J. Ex. 23, Dec. 14, 2015,

Let. Morris to Berger, ECF No. 104-25.)  (Berger said she did not read Morris's letter prior to the meeting "because . . . [she] wanted to try to put aside the letters from the attorneys, what [she] perceived to be threats of litigation, . . . and [she] just wanted to focus this on Mr. Williams trying to fit into this position."  (PSAB Transcript 59.)

Berger described the meeting of Walsh, Williams, and her on December 14 as "very tense."  (PSAB Transcript 62.)  Berger attributed the tension to the fact that when she and Walsh attempted to ask Williams "questions about the breaks—the things that Dr. Breuer [the psychologist] had talked about, . . . every attempt to ask him a question was met with, I can't answer that, or can I leave the room to discuss with my counsel, or can you please refer that question to my counsel."  (*Id.*)  After the meeting, Berger emailed Morris to inform him that she regarded his December 14 letter, which emphasized reliance upon Morris's requested accommodations set forth in his November 12 letter, as rendering void the medical release forms received since then.  (Def.'s Mot. Summ. J. Ex. 24, Dec. 14, 2015, Email Berger to Morris, ECF No. 104-26.)  She stated the significant physical restrictions prescribed by the two doctors that were attached to Morris's November 12 letter could not be accommodated by the County in the Engineer II position.  (*Id.*)  She then said,

> If you wish to confirm, in writing, that Mr. Williams desires to submit and rely upon the REVISED Medical Information Authorization Release forms of Dr. Matthews (12/4/2015) and Dr. Whiteford (12/9/2015), in lieu of their earlier release in Attachment 3 [to Morris's November 12 letter], we can continue the process of evaluating the additional requested accommodations for the ADHD condition.  If you cannot provide this confirmation we will be left with the statements in your letters of December 14, 2015 and November 12, 2015, on behalf of Mr. Williams, and he will not be eligible for consideration for the Engineer II position based on the stated physical restrictions of his medical providers.
>
> Please advise.

(*Id.*)

Morris responded by asking Berger to rely upon Dr. Whiteford's later assessment, but did not provide a clear explanation of how to treat Dr. Matthews's December 4 assessment:

> I spoke with Dr. Matthews the afternoon before he submitted his assessment, and the view he explained to me was no different from the position submitted by Dr. Whiteford. There was no conflict. *Based upon my prior communication with Dr. Matthews, I have every reason to believe that the submission he offered was the result of some miscommunication or confusion relating to the form that he submitted.*
>
> As I am now clarifying, the accommodation requested by Mr. Williams is based upon the assessment that you have from Dr. Whiteford because that assessment, as I understand what you have, is consistent with her prior discussion with me. *To the extent that the submission from Dr. Matthews appears not to be consistent with his prior discussion with me, I would be happy to secure for you a clarification from him if such is needed for you to resolve the question of reasonable accommodation* and get Mr. Williams back to work.

(Def.'s Mot. Summ. J. Ex. 25, Dec. 15, 2015, Let. Morris to Berger, ECF No. 104-27.)

The language emphasized by the Court in this quotation is unresponsive to Berger's request for Morris to clarify whether Williams is relying upon Dr. Matthews's December 4 assessment; Morris's use of "prior communication" and "prior discussion" do not reference particular dates and leave the undersigned wondering whether Morris was disavowing the December 4 assessment by Dr. Matthews. In any event, the letter did not clarify the point requested by Berger in her email to Morris.

However, Berger evidently determined that she should rely upon Dr. Matthews's December 4 assessment based upon her letter to Williams dated December 16, 2015. (*See* Def.'s Mot. Summ. J. Ex. 26, Dec. 16, 2015, Let. Berger to Williams, ECF No. 104-28.) In that correspondence, Berger noted that Williams's doctors had cleared him for the DPW Engineer II position without need for any accommodations as to physical activity. (*Id.* 1.) She then stated,

> That leaves the additional question of how we can reasonably accommodate your ADHD condition, as documented by Dr. Breuer. Of course we understand our obligation to make such accommodations under the ADA, and

want to work with you in good faith to provide you with every reasonable accommodation you need to perform the essential functions of the position. According to the form completed by Dr. Breuer on November 3, 2105 [*sic*], it is his opinion that the following accommodations / modifications will assist you in performing the Engineer II job:

1. Larger Cubicle Space
2. Organizational Assistance for your Cubical [*sic*] Space
3. Allowance to take off to see a therapist and/or ADHD coach on a weekly basis
4. Allowance for 10 minute breaks every hour
5. Performance reviews every three months with specific and clear feedback

We have considered the requested accommodations for ADHD, and in consultation with the Department of Public Works, we are reasonably able to provide the following accommodations without creating an undue hardship on the operations of the Department:

1. The cubicle work spaces in the proposed office area for the position are the same standard size, and there are . . . no "large" versus "small" cubicle spaces. If you are placed in the DPW position you would have a standard cubicle workspace, however, you will be able to utilize other work spaces or areas such as conference rooms, to the extent they are open and available and not otherwise reserved.

2. Organizational Assistance in the form of moveable shelving and bins would be provided at no cost to you by OHR.

3. You would be authorized to use up to 2 hours per week of your available sick or other leave to attend scheduled weekly therapy appointments, with your understanding and agreement that the scheduling of such appointments is to be done in advance, with notice to your supervisor of the specific day and time of the appointment at least one week in advance of the appointment. Please note that time spent attending such therapy will be designated as FMLA by the County as an intermittent use of FMLA leave. We will provide you with all the paperwork necessary to apply for that FMLA status.

4. You would be allowed to take a 10 minute break per hour as needed, with the understanding that this reflects a brief period <u>per hour</u>, not a single block or blocks of time to be taken on a less frequent basis during the workday. For example a continuous 30 minute break within a 3 hour period is not consistent with the requested accommodation.

5. Your performance will be formally evaluated every three months for the first 6 months as you have requested, and you will be provided with specific and clear feedback on all performance issues that may be

identified. After the second such evaluation, the Department in conjunction with the Office of Human Resources, will determine the frequency of all following performance reviews as it may deem reasonable and necessary.

Please understand that the need for reasonable accommodations under the Americans With Disabilities Act does not serve to eliminate the requirement that an employee must successfully perform the essential functions of their job. We are willing to make continuing good faith efforts to provide you with those items that your health care providers have identified, in the manner that we can reasonably provide them. It will be up to you to extend your best efforts to perform the duties of the position with the accommodations provided. *If you elect to accept the offer of the Engineer II position in the Department of Public Works under the terms outlined herein, please indicate your agreement by returning the signed and dated original to me in the envelope provided by Monday, December 21, 2015.* I have enclosed an extra copy for your records.

Very truly yours,

[signature]

Suzanne T. Berger
Deputy Director

STB/vr
cc:     John H. Morris, Jr., Esq.

_____          _____
DATE                                              LAMAR A. WILLIAMS

(*Id.* (italicized emphasis supplied).)

Williams did not date and sign the letter and return it to Berger. Instead, on December 21, his attorney wrote to Berger "to clarify [Williams's] acceptance of the Engineer II position." (Def.'s Mot. Summ. J. Ex. 27, Dec. 21, 2015, Let. Morris to Berger 1, ECF No. 104-29.) Morris disputed that no physical accommodations were required for the offered position. (*Id.* 2, 3.) Morris indicated Williams did not waive any right to sue the County for what Morris and Williams regarded as violations of governing disabilities law (*id.* 1, 3), and he also indicated

that the context of the County's discussions with Williams about accommodations in the offered position were "an obvious effort to circumvent legal exposure resulting from Mr. Gardina's actions" (*id.* 2). Morris then stated,

> Within the context of an effort to avoid a pending discrimination claim that the position you have offered may or may not avoid, I am authorized to convey, on behalf of Mr. Williams, that he will proceed consistent with his legal obligation to mitigate his damages by accepting the position. *Whatever terms you chose to offer the position are for you to make, subject to the County's obligation to conform its actions to the requirements of federal and State disability laws. The law does not require that Mr. Williams accept these conditions.*

(*Id.* (emphasis supplied).)

Morris also stated in regard to the offered accommodation of performance evaluations of Williams at three-month intervals for the first six months, "it would clarify the situation and avoid any suggestion that such actions at these later times were merely a continuation of the unlawful retaliation committed by Mr. Gardina if the County were to (1) identify as soon as possible the criteria upon which Mr. Williams' performance will be assessed both at the 3-month period and later at the 6-month period and (2) make the process for assessing those criteria as transparent as possible." (*Id.* 3-4.) Morris then stated, "I trust that my response on behalf of Mr. Williams brings this matter to a conclusion that allows him to proceed to his new position as quickly as possible. If we are resolved, please convey to Mr. Williams the site of his new assignment and the date he is expected to report." (*Id.* 4.)

Morris's letter, in the Court's view was, at best, a qualified acceptance of the County's offer. *See Baltimore Cty. v. Archway Motors, Inc.*, 370 A.2d 113, 116 (Md. Ct. Spec. App. 1977) ("'A reply to an offer which alters in any manner the suggested method of performance is not a true acceptance of the offer, but in reality is a conditional or qualified acceptance, which amounts to a counter-offer.'"). His letter certainly was not an acceptance in keeping with the

required response mandated by the County's offer, *i.e.*, for Williams to date and sign the County's letter and return it to Berger by December 21, 2015. Morris's letter refuted the validity of Dr. Matthews's unconditional clearance of Williams to work in the offered position, thereby throwing into doubt the foundation upon which the offer was made. And it indicated that Williams did not have to accept the *conditions* of the offer in order to accept the *position* offered, but the offer itself did not suggest such parsing was allowable because it required that Williams accept "the Engineer II position in the Department of Public Works under the terms outlined herein." Moreover, Morris's letter continued to threaten legal action based on the County's conclusion that Williams could not continue to work as a plans reviewer in the Storm Water Management Division and its decision to put him on paid leave pending the County's consideration of his request for reasonable accommodations.

The County could have reasonably regarded Morris's letter, in the absence of Williams's signed and dated acceptance of the offer letter, as a rejection of the offer. Apparently, the County did exactly that. (Def.'s Mot. Summ. J. Supp. Mem. 24, ECF No. 104-1.) Berger testified in the PSAB hearing as to the offer:

> And I sent a copy to his attorney. And I did that because we had been around and around the block on what the accommodations were that he—and I wanted it—it wasn't under any other terms. The only offer made was this position under these terms. And it was basically either take it or leave it.

> We feel we've investigated this thoroughly. We feel we've gotten your physicians' opinions on everything. We feel we've, you know, we can accommodate everything that's needed to be accommodated reasonably, and here it is. If you want it, sign this. We don't want other terms or other extras. This is what we want to offer you and this is what we want to know if you are willing to accept. And that was the deal.

(PSAB Transcript 69.)

Williams has failed to counter the evidence that the County did engage in the interactive process described in the governing regulations. Williams has also failed to counter the evidence that the County's offer of an Engineer II position in DPW was a reasonable accommodation of the restrictions established by his health care providers in relation to his disabilities. Williams has produced no evidence that he was subjected to unlawful retaliation for engaging in protected activity or that the County violated the ADA.

## V. Conclusion

The Court concludes that the evidence does not support Williams's allegation that the County violated his rights under the ADA. Consequently, the County is entitled to judgment as a matter of law. A separate order will enter.

DATED this 21st day of May, 2018.

BY THE COURT:

_____/s/_____
James K. Bredar
Chief Judge